**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION**

| | | |
|---|---|---|
| TINA OLDHAM, | ) | |
| on Behalf of herself and All Others | ) | |
| Similarly-situated, | ) | |
| | ) | **PROPOSED COLLECTIVE ACTION** |
| *Plaintiff,* | ) | |
| | ) | CASE NO. 4:19-CV-62-JHM |
| v. | ) | |
| | ) | |
| LAND O'FROST, INC. | ) | **JURY DEMANDED** |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

**COMPLAINT**

Comes Plaintiff Tina Oldham (hereinafter collectively referred to as "Plaintiff"), on behalf of herself and all others similarly-situated, and brings this action as both a collective action pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*. ("FLSA") and a class action under Kentucky state law against Defendant Land O'Frost, Inc. (hereafter, "Defendant"). Defendant is engaged in the business of producing and selling pre-sliced lunch meats for retail sales and operates production, slicing and packing facilities, including one in Madisonville, Kentucky (hereafter, the "Madisonville Facility"). Defendant employs non-exempt employees at the Madisonville facility and other production facilities in the United States (including facilities at Searcy, Arkansas and Lansing, Illinois). Plaintiff brings this Complaint for Defendant's violations of its statutory obligations to pay employees for work performed, including overtime work. Specifically, Defendant has willfully engaged in the practice of not paying its employees for compensable work, including time donning protective clothing and cleaning workstations for Defendant's benefit in Defendant's meat-processing facilities.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the claims of Plaintiff and those similarly-situated pursuant to 28 U.S.C. §§ 1331 and 1337, and 29 U.S.C. § 216(b).

2.      Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) because Defendant operates a facility located in the Western District of Kentucky, in Madisonville, Hopkins County, Kentucky (the "Madisonville facility") and employed Plaintiff at that facility and thus Defendant conducts business and can be found in the Western District of Kentucky.

## PARTIES

3.      Plaintiff is a resident of Hopkins County, Kentucky.

4.      Defendant is an Illinois For-Profit Corporation.

5.      Defendant has registered itself with the Kentucky Secretary of State as having a principal office at 16850 Chicago Ave., Lansing, IL 60438, and indicated that it may be served by service upon its registered agent, CT Corporation System, at 306 W. Main St., Suite 512, Frankfort, KY 40601.

6.      Defendant employs Plaintiff and non-exempt employees similarly-situated to Plaintiff, including in its Madisonville Facility.

7.      The Madisonville Facility in Madisonville, Kentucky is in Hopkins County, within the District of the United States District Court for the Western District of Kentucky.

8.      Defendant's annual sales have, at all times relevant to this Complaint, exceeded $500,000.00.

9.      At all times relevant to this Complaint, Defendant has regularly engaged in interstate commerce and was an employer within the meaning of the FLSA, 29 U.S.C. §§ 206-207.

## FACTUAL ALLEGATIONS

10.     Plaintiff is an employee of Defendant and has worked for Defendant as a "Tray Loader/Packer" at the Madisonville facility from approximately June 22, 2015 to the date of filing this action (Plaintiff has been inactive due to a worker's compensation injury since August, 2017 other than light-duty work for approximately two hours on September 10, 2018).

11.     Throughout her employment with Defendant, Plaintiff was at all times a non-exempt employee of Defendant within the meaning of the FLSA.

12.     Further, Defendant has at all times classified the position of "Tray Loader/Packer" as non-exempt under the FLSA.

13.     The work of "Tray Loader/Packer" involves picking up ready-to-eat slices of lunch meat from a production line after the meat is sliced by slicing machinery and loading (or "packing") the slices of meat into trays (which are subsequently sealed for sale to consumers).

14.     Defendant maintained a timeclock system for its employees at the Madisonville Facility whereby employees are instructed to clock in upon arriving at Defendant's facility, and to clock out upon ending work.

15.     The intended purpose of the timeclock system maintained by Defendant at the Madisonville Facility (and, indeed, the purpose of such timeclock systems in general) is to enable the employer to accurately record each employee's actual hours worked so that the employer may pay the employee in accordance with such actual hours worked, including overtime pay, if earned in a particular work week.

16.     However, Defendant perverted the purpose of its timeclock system in order to illegally use the timeclock system to systematically deprive its workers of pay (including overtime pay) for work (including overtime work) performed by Defendant's employees.

17.     Defendant knew that it was required to pay Plaintiff and similarly-situated employees for time worked, including overtime pay for hours worked in excess of forty per week.

18.     However, despite this knowledge, Defendant intentionally chose to program its timeclock system to avoid payment for work (including overtime work) that Plaintiff and similarly-situated employees actually performed.

19.     Specifically, Defendant programs its timeclock to allow employees to clock in early; each employee is permitted to clock in as early as fifteen minutes prior to the scheduled beginning of her shift.

20.     By utilizing its timeclocks correctly, Defendant could have accurately measured and paid for the exact amount of time work is performed prior the scheduled beginning of the shift (the time clock system is capable of recording, and, upon information and belief, actually does record, the exact time the employee clocks in).

21.     However, Defendant does not utilize its timeclocks correctly to measure and pay for employees' actual time worked.

22.     Instead, employees are required to perform work prior to the scheduled beginning of the shift.

23.     However, regardless of the actual time the employee clocks in and regardless of the actual time the employee begins performing compensable work, Defendant's policy is to only pay employees for their time worked after the scheduled beginning of their shift (i.e., Defendant's policy is to not pay employees for their time worked prior to the scheduled beginning of the shift).

24.     In order to be able to properly perform Plaintiff's work, Defendant requires Plaintiff to first don protective gear and clothing.

25.     Specifically, after clocking in, but before the employee begins being paid, each employee employed at the Madisonville facility as a "Tray Loader/Packer" must don a smock, cloth gloves, plastic gloves, plastic sleeves, hairnet, ear protection, safety glasses and a plastic apron (all of which clothing and equipment must, as part of the work of each employee, be donned at the beginning of each work shift and after every work break, and doffed after every work shift, and before every work break).

26.     In addition to these materials, for a certain period of time within the last five years, employees were also required to, prior to the scheduled beginning of the shift, don safety glasses.

27.     Employees are required to put on and take off this protective clothing and equipment as an essential part of the production process that guarantees the quality of Defendant's product.

28.     If Defendant did not require the use by employees of protective clothing, Defendant would be unable to legally produce and sell its lunch meat product in accordance with Food and Drug Administration requirements.

29.     Prior to the scheduled start of the work shift, employees are required to don a smock for sanitary purposes, protecting the meat products for consumers, and also needed for the employees' warmth and bodily protection because the workplace is kept very cold for food quality and safety.

30.     Employees are not permitted to wear smocks other than those issued by Defendant.

31.     Defendant causes the smocks to be laundered and made available to the employees.

32.     Defendant's Employee Handbook, a copy of which is attached hereto as Exhibit 1, provides, at Page 43, under the Section "GMP, Food Safety, and Food Defense", under the subsection "Smocks", the following:

## SMOCKS

All employees in production areas are required to change their smock or coat on a daily basis.  Following is a list of rules to be followed.  Included in this list are rules also pertaining to the use of the disposable sleeve guards and the disposable of plastic aprons.  Your full cooperation would be appreciated to make this program work smoothly.

- Smocks must cover collars and hoods on personal clothing.
- Smocks and jackets are to be picked up in route to your work area.  No smock or jacket is to be worn into the restroom area, locker area, lunchroom, or outside the plant.  Use the hoods provided.
- Deposit your used smock at the end of the shift in containers provided.  If your smock has pockets, please make sure everything has been removed from the pockets.
- Drop points for dirty smocks and jackets will remain as they are now, but if additional locations are required we will provide them.
- Employees must wear all cloth sleeves, disposable sleeves, disposable aprons, etc. as required for your job.

33.     Prior to the scheduled start of the work shift, employees are required to don cloth gloves needed for sanitary purposes, protecting the meat products for consumers, and also needed for the employees' warmth and bodily protection because the workplace is kept very cold for food quality and safety, and to protect the employee's hands.

34.     Employees are not permitted to wear cloth gloves other than the ones issued by Defendant.

35.     Defendant causes the cloth gloces to be laundered and made available to the employees.

36.     Cloth gloves are issued in multiple sizes, but are not sorted into boxes by size.

37.     Instead, prior to the scheduled beginning of the shift, each employee must sort through the box of laundered gloves to attempt to locate two gloves of the correct size.

38.     Prior to the scheduled beginning of the shift, employees are required to don (on top of the cloth gloves) plastic gloves for sanitary purposes, protecting the meat products for consumers.

39.     Employees are not permitted to wear plastic gloves other than the ones issued by Defendant.

40.     Defendant's Employee Handbook, a copy of which is attached hereto as Exhibit 1, provides, at Page 37, under the Section "Safety", under the Subsection "General Safety Rules", the following: "Always wear required Personal Protective Equipment such as gloves… when required."

41.     Defendant's Employee Handbook, a copy of which is attached hereto as Exhibit 1, provides, at Page 43, under the Section "GMP, Food Safety, and Food Defense", under the subsection "Personal Sanitation", the following: "Where applicable for handling product, gloves will be provided.  Clean gloves are available at all times."

42.     Prior to the scheduled beginning of the shift, employees are required to don a hairnet and, if applicable, a beard net, to protect the meat products for sanitary purposes, shielding the meat products for consumers.

43.     Employees are not permitted to wear hairnets or beardnets other than the ones issued by Defendant.

44.     Defendant's Employee Handbook, a copy of which is attached hereto as Exhibit 1, provides, at Page 42, under the Section "GMP, Food Safety, and Food Defense", under the subsection "Hair Covering", the following:

> All persons in an area where product is exposed will wear a hairnet, regardless of the length of the hair.  The hairnet must be worn in such a fashion as to cover all the hair on the top, back, and sides of the head and must cover your ears.  Employees with beards and/or mustaches beyond the corner of the mouth will wear beard nets. The hairnets or beard nets worn will be those supplied by the Company.  No other hairnet or beard net will be authorized for wear.  Wearing of unauthorized hairnets or beard net is a violation of this policy and will result in corrective action.  Do not wear your hair net out of the plant.  The areas where hairnets and/or beard nets are required include meat receiving, all processing areas, all packaging areas, and any other areas where product may be exposed.

45.     Prior to the scheduled beginning of the shift, employees are required to don industrial hearing protection earmuffs, shielding the employee from the harmful noise pollution of the Defendant's facility.

46.     Defendant's Employee Handbook, a copy of which is attached hereto as Exhibit 1, provides, at Page 37, that "Hearing Protection shall be worn in specified areas of the facility in accordance with OSHA Law."

47.     It further provides that:

Land O'Frost issues safety equipment for one reason, to protect our employees from injuries that can be prevented by proper wearing of this equipment.  Whether it is a mesh glove, safety goggles or earplugs, we expect the employee to do their part by wearing the equipment properly.  Maintenance employees are required to wear cotton clothing.  Your supervisors have been instructed to enforce proper wearing of equipment.  Plant management will follow up on Safety compliance issues and will perform periodic inspections.

48.     For a period of time, prior to the scheduled beginning of the shift, employees were required to don safety glasses, shielding the employee's eyes while working in the Defendant's facility.

49.     Prior to the scheduled beginning of the shift, employees are required to don plastic aprons to protect the meat products for sanitary purposes, shielding the meat products for consumers.

50.     Employees are not permitted to wear plastic aprons other than the ones issued by Defendant.

51.     Employees are issued the above-listed equipment and clothing, which are (with the exception of the earmuffs, which are sold by Defendants to employees, but are generally kept by employees at Defendant's facility at all times), the property of Defendant, and not permitted to take equipment or clothing home or to use the employees' own versions of the above-listed equipment and clothing (e.g., an employee is not permitted to bring and wear her own "smock").

52.     The following is a picture (hereafter, the "Website Picture") of an employee of Defendant wearing some[1] of the protective clothing and equipment of the type described above while at one of Defendant's lunch-meat production facilities ("logs" of unsliced lunch meat can be seen in the background):



53.     Defendant posted the Website Picture to its website.

---

[1]     The picture does not show the employee's hands, and thus does not show the required cloth gloves and plastic gloves.

54.     A true and accurate copy of a page of Defendant's website, including the Website Picture, is attached hereto as Exhibit 2.

55.     Upon information and belief, the employee pictured in the foreground in the Website Picture was not, due to the illegal practices described herein, paid by Defendant for her time on the day the Website Picture was taken donning the clothing and equipment described above and depicted in the Website Picture.

56.     In addition to time donning the above-listed clothing and equipment, Defendant's employees are required by Defendant to travel from the place where they first begin performing their work to two separate stations to engage in specialized washing procedures.

57.     This washing is done for the benefit of the Defendant and its product, and not for the benefit of the employees.

58.     Indeed, Defendant's Employee Handbook, a copy of which is attached hereto as Exhibit 1, provides, at Page 43, under the Section "GMP, Food Safety, and Food Defense", under the subsection "Personal Sanitation", the following:

> All persons working in a production department or handling exposed product must wash hands thoroughly and sanitize before starting work, as well as after each absence from the work station and at any time other than this when the hands may become soiled or contaminated.  Any persons showing evidence of a communicable disease in a transmission stage, or known to be a carrier of such a disease, or affected with boils, sores, infected wounds, or other abnormal sources of microbiological contaminants, will not be allowed in the plant.  Feet must be completely covered.  Types of shoes allowed are covered separately under safety rules.  Employees , who do not practice good personal hygiene, including the wearing of dirty or otherwise unsanitary clothes, will not be allowed to work.  Upon information and belief, if Defendant did not require the use by employees of these specialized washing procedures, Defendant would be unable to legally produce and sell its lunch meat product in accordance with Food and Drug Administration requirements.

59.     Specifically, prior to the scheduled beginning of the shift, after retrieving their smock and earmuffs, employees must travel to a hand wash station and wash their hands.

60.     Defendant instructs and trains employees to spend during this hand-washing procedure a longer-than-usual amount of time washing their hands (i.e., a longer amount of time scrubbing the hands together after applying water and soap than average members of the American public generally spend on average so scrubbing their hands during their own personal handwashing on their own time, which is approximately six seconds per handwash).

61.     Indeed, Defendant trains its employees by requiring them to watch a video that instructs that employees should sing to themselves the song "Happy Birthday" while they scrub their hands after applying water and soap and continue scrubbing their hands until the song is completed at a regular tempo, and to then sing to themselves the song "Happy Birthday" again a second time and continue scrubbing their hands until the song is completed at a regular tempo.

62.     Defendant provides these instructions to employees regarding the hand-washing procedure specifically for the purpose of seeking to increase the amount of time spent by employees scrubbing their hands after the application of soap and water from the average of approximately six seconds to a time longer than twenty seconds (i.e., more than three times as long as an average amount of scrubbing).

63.     After engaging in this hand-washing, employees must dry their hands before putting on the required cloth gloves and then the required plastic gloves.

64.     In addition to the hand-washing procedure, prior to the scheduled beginning of the shift, employees are required to walk over a specialized foot-washing device that washes and sanitizes the bottoms of the employee's shoes or boots.

65.     Defendant's Employee Handbook, a copy of which is attached hereto as Exhibit 1, provides, at Page 43, under the Section "GMP, Food Safety, and Food Defense", and the subsection

"Cross Contamination", the following: "Employees … cannot enter the RTE[2] area without going through the boot scrubber."

66.     Prior to the scheduled beginning of the shift, after donning the clothing and equipment described above, travelling to the various stations necessary to obtain such clothing and equipment and engage in the cleaning procedures described above, engaging in those cleaning procedures, and travelling to their workstation on Defendant's production line, employees are required to perform additional work at the production line prior to the scheduled beginning of the shift.

67.     Specifically, employees are required to wipe down and clean the workstation, and equipment located at the workstation.

68.     Defendant regularly and systematically failed to pay for its employees' time donning the clothing and equipment described above, engaging in specialized cleaning procedures for Defendant's benefit, and for performing other work at the workstation which was performed prior to the start of Defendant's production line.

69.     Instead, Defendant would begin paying its employees only when the production line began running at the scheduled beginning of the shift, although the employees performed work prior to that time.

70.     For instance, Plaintiff was regularly scheduled to work a shift starting at 5:00 a.m.

71.     Although Plaintiff could clock in as early as 4:45 a.m, and the timeclock would, upon information and belief, register the exact time when Plaintiff would clock in, Defendant would not begin paying Plaintiff until 5:00 a.m.

---

[2]      "RTE" refers to "Ready to Eat."  Employees employed as "Tray Loader/Packer" work in the "RTE area."

72.    All of the work described above was required to be performed by Plaintiff and the other similarly-situated employees prior to the scheduled start of the shift (in Plaintiff's case, 5:00 a.m.).

73.    Employees were subject to discipline, and were in fact disciplined, if they had not performed the work described above prior to the scheduled beginning of the shift (in Plaintiff's case, 5:00 a.m.).

74.    All of the work described above was integral and indispensable to the principal activities which the employees were engaged by Defendant to perform (loading ready-to-eat lunch meat into trays so that the trays could be sealed for sale to customers).

75.    However, Defendant willfully chose not to pay for its employees' work described above.

76.    Indeed, Defendant was well-aware that employees were performing the activities described above for Defendant's benefit.

77.    For instance, employees would complain to management about not being paid for the activities described above, and management would brush off the concerns, stating "it's only a few minutes," or words to that effect.

78.    Further, Defendant instituted procedures under which frontline supervisors were instructed and required by upper management to specifically warn employees during their scheduled break time that the line was going to resume soon, so that employees would begin performing the activities described above during the remainder of their "break" so as to be on the production line, ready to begin loading meat into trays, and so that the production line could accordingly begin moving immediately upon the scheduled conclusion of the "break."

79.     In this manner, Defendant not only failed to pay for its employee's compensable work prior to the scheduled beginnings of shifts, but also failed to pay for employee's compensable work expended during scheduled breaks.

80.     29 U.S.C. § 203(o), which permits employers with unionized workforces to bargain with employees for terms in a collective bargaining agreement specifying that the employer need not pay for otherwise-compensable time "changing clothes," does not apply to Defendant and its employees as Defendant's workforce is not unionized and there is no collective bargaining agreement.

81.     Indeed, to the contrary, Defendant loudly trumpets its non-union status in its employee handbook (Exhibit 1 hereto), stating at Page 8 the following:

### WHAT ABOUT UNIONS?

In today's uncertain world there are many pressures and anxieties.  At Land O'Frost we want to keep our plant free from any artificially created tensions and work interruptions which often arise when a union is on the scene.  There are many other companies where employees have chosen not to have a union.  We think it is a commendable choice.  We do not believe that union representation of our employees would be in the best interest of either the employee or the company.

We wish to assure you that it is never going to be necessary for any of our employees to belong to any type of outside organization in order to enjoy the benefits and job security that comes with working for this company.  We do not need any outsiders to remind us that if we are going to progress as a company, we must also progress as employees.

We have enthusiastically accepted our responsibility to provide you with good working conditions, good wages and benefits, fair treatment and personal respect.  All this is part of your job at Land O'Frost and does not have to be "purchased" from an outside party.

82.     The unlawful conduct by Defendant complained of herein has been widespread, repeated and consistent with respect to Plaintiff and similarly-situated employees.

83.     Defendant has willfully engaged in a pattern and practice of unlawful conduct by declining to record and pay for all of the time it requires or permits its members of the proposed class to work, in violation of the FLSA.

84.     Defendant knew or should have known that its supervisory and management personnel permit or require Plaintiff and other members of the proposed class to perform work which is for the benefit of Defendant, and which is integral to Defendant's business, without appropriate compensation, including time in connection with the unlawful practices described above.

85.     Indeed, Defendant specifically provides in its Employee Handbook that employees are not to be paid for their time prior to "the start of your shift" and "the beginning of your scheduled work time," and that only management is permitted to approve "any temporary changes in your start … time."

86.     Specifically, the Employee Handbook, at Page 16, provides:

**<u>PAY PRACTICES</u>**

**<u>Time Clock</u>**

In determining your pay, we are required by law to have a record of your working hours each day and each week.  We facilitate this requirement by having you clock in at a time clock.  The law also requires that you not be punched earlier than a few minutes before the start of your shift, or out later than a few minutes following the end of your shift.  We therefore require that you do not clock in any earlier than fifteen (15) minutes before the beginning of your scheduled work time, or later than fifteen (15) following the end of your scheduled work time.  Failure to follow the procedure above may result in corrective action, up to and including discharge.  If you forget to punch in or out notify your Supervisor immediately so they can make your punch.  Any falsification of your time will result in immediate dismissal.

We realize that occasionally an employee might forget to clock in when they begin or end their shift. Therefore, we have decided to use the following as a guideline for the issuance of corrective action in cases of repetitive failure to follow the procedure.

An employee will be allowed one failure to clock in or out per 30-day period without corrective action.  The second failure in a 30-day period will result in

corrective action.  The step to be taken is dependent upon the employee's last step in the progressive action for policy/procedure violations.  As an example, if an employee's last step in the previous 12 months had been a Written Warning I, then the employee would receive a Written Warning II.  After a corrective action has been issued for failure to clock in, if you fail to clock in again, you will not receive corrective action for that infraction, but a new 30-day clock will start.  The second violation in that 30-day period will result in corrective action.

Your Supervisor, Manager, or the Human Resources Department is the only ones allowed to correct your time.  The Human Resource Staff and your Supervisor are available should you find an error on your paycheck.  Human Resources will not authorize payment unless your time record has been approved by your Supervisor. Your Supervisor must approve the following items:  any overtime, any temporary changes in your start or finish time, any "no lunch" occurrences, or any other items which deviate from the normal situation.

87.     The conduct of Defendant, set forth above, has been willful, in bad faith, and has caused significant damages to Plaintiff and other members of the proposed class.

## COLLECTIVE ACTION ALLEGATIONS UNDER THE FLSA

88.     Plaintiff brings this action under the FLSA on behalf of herself and all similarly-situated current and former employees of Defendant who worked for Defendant and were not paid for overtime work performing the activities described above which Defendant should have paid within the last three years for work in any non-exempt position at any production facility of Defendant, including the Madisonville Facility.

89.     Stated another way, Plaintiff seeks to bring this action as a collective action under the FLSA on behalf of the following persons:

all current and former employees of Land O'Frost, Inc. who worked for Land O'Frost, Inc. in the United States and who (A) worked, during any workweek, in a position which is non-exempt under the FLSA and which required the employee to, prior to the scheduled start of the production line, put on protective clothing or equipment, engage in cleaning procedures, and/or clean his or her workstation and/or equipment at the workstation, (B) worked more than forty hours in such workweek, including such activities, and (C) was scheduled to receive payment for work performed in such workweek on or after June 13, 2016, and (D) was not fully compensated for such overtime hours worked in violation of the FLSA.

90.     The employment policies, practices and agreements of Defendant raise questions of fact common to the class including:

a.      whether Defendant has engaged in a pattern or practice of permitting or requiring Plaintiff and members of the proposed class to work in excess of forty hours per workweek for the benefit of Defendant and without appropriate compensation, in violation of the FLSA;

b.      whether Defendant has engaged in a pattern or practice of failing to keep accurate records showing all hours worked by Plaintiff and members of the proposed class, in violation of the FLSA;

c.      whether the conduct of Defendant was willful;

d.      whether Plaintiff and members of the proposed class are entitled to lost wages, liquidated damages and the other relief requested.

91.     The claims of Plaintiff are similar to those of the proposed class members, in that Plaintiff has been subject to the same conduct as members of the putative collective action and Plaintiff's claims are based on the same legal theory as members of the collective action.

92.     Plaintiff's FLSA claims are maintainable as a collective action pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b).  Plaintiff's consent to join this action was attached to the initial Complaint filed in this matter (Ct. Doc. 1) as Exhibit 3 (Ct. Doc. 1-2).

### CLASS ACTION ALLEGATIONS UNDER KENTUCKY LAW PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23

93.     Plaintiff brings this action under Kentucky state law on behalf of herself and all similarly-situated current and former employees of Defendant who worked for Defendant within

the last five years in any non-exempt position for which such employee's time was recorded using a timeclock.

94.     Plaintiff brings this action on behalf of themselves and the following proposed class of similarly-situated employees:

> all current and former employees of Land O'Frost, Inc. who worked for Land O'Frost, Inc. in the United States and who (A) worked, during any workweek, in a position which is non-exempt under the Kentucky Wages and Hours Act and which required the employee to, prior to the scheduled start of the production line, put on protective clothing or equipment, engage in cleaning procedures, and/or clean his or her workstation and/or equipment at the workstation, (B) worked more than forty hours in such workweek, including such activities, and (C) was scheduled to receive payment for work performed in such workweek on or after June 13, 2014, and (D) was not fully compensated for such overtime hours worked in violation of the Kentucky Wages and Hours Act.

95.     Plaintiff is a member of the class she seeks to represent.

96.     Defendant failed to pay Plaintiff and the members of the class they seek to represent wages for work performed, as described herein, in violation Kentucky law, including the Kentucky Wages and Hours Act.

97.     Under Kentucky law, employers are required to compensate employees for all of the time that those employees spend working.

98.     Accordingly, Defendant's refusal to pay Plaintiff for all of the hours that Plaintiff actually worked violated Kentucky law.

99.     The Rule 23 class is sufficiently numerous that joinder of all members is impractical, satisfying Federal Rule of Civil Procedure 23(a)(1). On information and belief, Defendant has employed hundreds of individuals in Kentucky who were subject to Defendant's illegal policy described above of not paying for compensable work.

100.    All members of the Rule 23 Class share the same pivotal questions of law and fact, thereby satisfying Federal Rule of Civil Procedure 23(a)(2).  Namely, all members of the Rule 23

class share the questions of (1) whether Defendant paid them for all time worked; and (2) whether Defendant's failure to pay class members for all time worked resulted in Defendant violating the Kentucky Wage Statutes.

101.    The claims of Plaintiff are typical of the claims of the Rule 23 Class, thus satisfying Federal Rule of Civil Procedure 23(a)(3).  Defendant's failure to pay Plaintiff for all hours worked was not the result of any Plaintiff-specific circumstances.  Rather, it arose from Defendant's common pay policies, which Defendant applied generally to its employees.

102.    Plaintiff will fairly and adequately represent and protect the interests of the Rule 23 Class.

103.    Further, Plaintiff has retained competent counsel experienced in representing classes of employees against their employers related to their employers' failure to pay them properly under the law, thus satisfying Federal Rule of Civil Procedure 23(a)(4).

104.    By failing to pay Plaintiff, and similarly-situated employees, for all hours, Defendant has created a scenario where questions of law and fact common to the Rule 23 Class Members predominate over any questions affecting only individual members. Thus, a class action is superior to other available methods for fair and efficient adjudication of this matter. Accordingly, Plaintiff should be permitted to pursue the claims herein as a class action, pursuant to Federal Rule of Civil Procedure 23(b)(3).

### COUNT I – VIOLATION OF FLSA – NONPAYMENT OF OVERTIME – PLAINTIFF AND THOSE SIMILARLY-SITUATED

105.    Plaintiff incorporates by reference all preceding paragraphs as if the same were set forth again fully at this point.

106.    Defendant has willfully violated the FLSA by engaging in a pattern or practice (or patterns or practices) of:

a.    failing to keep accurate records showing all the time it permitted and/or required Plaintiff and members of the proposed collective action to work, from the first compensable act to the last compensable act, which has resulted in the denial of compensation at an overtime rate as required by the FLSA, for all time worked in excess of forty hours in a work week; and

b.    permitting and/or requiring Plaintiff and members of the proposed collective action to perform integral and indispensable activities (work) with, and in addition to working forty hours in a work week, for the benefit of Defendant and without compensation at the applicable federal overtime rates.

107.    As a result of Defendant's violations of the FLSA, Plaintiff and those similarly-situated to her suffered damages, including their lost overtime, for which they should be awarded compensatory damages, liquidated damages, and attorney's fees and other reasonable litigation expenses.

### COUNT II – VIOLATION OF KY. REV. STAT. ANN. §§ 337.275, ET SEQ BY NONPAYMENT OF WAGES.

108.    All previous paragraphs are incorporated as though fully set forth herein.

109.    Plaintiff brings this claim on behalf of all members of the proposed Rule 23 Class.

110.    Kentucky state law requires that covered employees be compensated for every hour worked in a workweek. See KY. REV. STAT. ANN. §§ 337.275, *et seq.* (hereinafter referred to as the "Kentucky Wage Statutes").

111.    KY. REV. STAT. ANN. § 337.285 requires that employees receive overtime compensation "not less than one and one-half (1-1/2) times" the employee's regular rate of pay for all hours worked over forty in one workweek.

112.    During all times material to this complaint, Defendant was a covered employer required to comply with the Kentucky Wage Statutes.

113.    During all times material to this complaint Plaintiff and the Rule 23 Class were covered employees entitled to the protections of the Kentucky Wage Statutes.

114.    Plaintiff, and the Rule 23 Class she seeks to represent are not exempt from receiving the Kentucky Wage Statutes' overtime benefits because they do not fall within any of the exemptions set forth therein. See KY. REV. STAT. ANN. § 337.285(2).

115.    Defendant has violated the Kentucky Wage Statutes with respect to Plaintiff and the Rule 23 Class by, inter alia, failing to compensate them for all hours worked at their regular rate (for time worked under forty hours per week) and at time-and-one-half overtime rates for all additional hours.

116.    In violating the Kentucky Wage Statutes, Defendant acted willfully and with reckless disregard of clearly applicable provisions of the Kentucky Wage Statutes.

117.    Pursuant to the Kentucky Wage Statutes, including KY. REV. STAT. ANN. § 337.385, Defendant, because it failed to pay employees the required amount of wages and overtime at the statutory rate, must reimburse the employees not only for the unpaid wages, but also for liquidated damages in an amount equal to the amount of unpaid wages.

118.    Pursuant to the Kentucky Wage Statutes, including KY. REV. STAT. ANN. § 337.385, Plaintiff and the Rule 23 Class are entitled to reimbursement of the litigation costs and attorney's fees expended if they are successful in prosecuting an action for unpaid wages.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays that the Court:

A.      Issue process and bring Defendant before the Court;

B.      Authorize notice to issue to members of the proposed collective action and permitting similarly-situated persons a reasonable opportunity to join this litigation with respect to claims under the FLSA;

C.      Certify a class of similarly-situated employees whose rights were violated by Defendant under State law, and grant relief available under state law, including unpaid wages, liquidated damages, and attorney's fees and other litigation expenses, to the class;

D.      Empanel a jury for the trial of all issues of fact;

E.      Enter a judgment awarding Plaintiff and similarly-situated persons joining this litigation damages from Defendant, including compensation for unrecorded work time, interest, and liquidated or exemplary damages, in amounts to be proven at trial;

F.      Award Plaintiff and similarly-situated persons joining this litigation all costs of litigation, including expert fees and attorneys' fees;

G.      Grant Plaintiff and similarly-situated persons joining this litigation all costs of litigation such other further and/or general relief, legal and/or equitable relief, to which they are entitled or which the Court otherwise deems appropriate.

Respectfully submitted,

/s/ Mark N. Foster
Mark N. Foster
Law Office of Mark N. Foster, PLLC
P.O. Box 869
Madisonville, KY 42431
(270) 213-1303
Mfoster@MarkNFoster.com
*Counsel for Plaintiff Tina Oldham*